**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JESSE JOSE RAMIREZ, | ) Case No.: 1:10-cv-01106-AWI-JLT |
| Petitioner, | ) <br> ) FINDINGS AND RECOMMENDATIONS TO <br> ) DENY PETITION FOR WRIT OF HABEAS |
| v. | ) CORPUS (Doc. 1) <br> ) |
| G. D. LEWIS, | ) ORDER DIRECTING THAT OBJECTIONS BE |
| Respondent. | ) FILED WITHIN TWENTY DAYS <br> ) |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**PROCEDURAL HISTORY**

Petitioner is in custody of the California Department of Corrections and Rehabilitation ("CDCR") serving an aggregate sentence of 30 years, four months, plus 15 years-to-life pursuant to a judgment of the Superior Court of California, County of Madera ("Superior Court") for, inter alia, attempted murder of a police officer (Cal. Pen. Code § 187, 664(a)); assault on a peace officer with a firearm (Cal. Pen. Code § 245(d)); discharging a firearm at an inhabited dwelling (Cal. Pen. Code § 246); negligent discharge of a firearm (Cal. Pen. Code § 246.3); being a felon in possession of a firearm (Cal. Pen. Code § 1201(a)(1)); and felony child endangerment (Cal. Pen. Code § 273A(a)). (Clerk's Transcript ("CT") 106-114, 132). The jury also found true two special gang enhancements.

1

1   (Id.).

2       Petitioner subsequently filed a direct appeal in the California Court of Appeals, Fifth Appellate

3   District ("5th DCA").   (Lodged Document ("LD") 1, 2, 3).   On September 5, 2007, the 5th DCA

4   affirmed Petitioner's conviction.   (Doc. 17, Exh. 1 ("Exh. 1")).    In response to his petition for review,

5   the California Supreme Court held that grossly negligent discharge of a firearm was a necessarily

6   included offense of discharge of a firearm at an inhabited dwelling.  (Doc. 17, Ex. 2).  Accordingly, on

7   remand, the 5th DCA reversed three of Petitioner's convictions for grossly negligent discharge of a

8   firearm.  (Doc. 17, Ex. 3).  Petitioner subsequently filed state habeas petitions at the trial and appellate

9   level, all of which were denied.  (LD 10; 12; 14).

10      On June 18, 2010, Petitioner filed the instant petition.  (Doc. 1).  Respondent's answer was filed

11  on November 5, 2010.   (Doc. 17).  On April 6, 2011, Petitioner filed his Traverse.  (Doc. 26).

12  Respondent concedes that all grounds for relief in the petition have been fully exhausted.  (Doc. 17, p.

13  13).

## FACTUAL BACKGROUND

14  The Court adopts the Statement of Facts in the 5th DCA's partially published decision:

16  Several Chowchilla police officers responded to a call claiming that a man was holding a gun
    to a woman's head inside an apartment. Outside the apartment, Officer Brian Esteves yelled,
17  "police department, occupants . . . please come out of the residence with your hands up." When
    no one responded, another officer, Sergeant David Noblett, knocked on a front window.
18  Immediately, a shotgun blast came through the window on which the officer had knocked. The
    officer was not shot, but felt the compression of the blast, was sprinkled with the shattered
19  glass, and fell backward. He got up and took cover behind a car. Between two and six more
    shots then came through the same window.
20

21  Defendant's wife emerged from the apartment carrying their five-year-old daughter. Officers
    asked her to come over to them, but she went back into the apartment with the child. A second
22  volley of shotgun blasts- two or three shots- then came through the same window. Some
    additional shots came out a back window.
23

24  The officers again ordered the occupants of the apartment to come out. Defendant's wife again
    emerged, set the child on the ground, told her to go to the officers, and went back inside. The
25  Chowchilla police chief was on the scene; he left his position of cover, picked up the child, and
    ran back.
26

27  A third volley of two to five shots followed. Defendant's wife emerged from the apartment a
    third time and told the officers that defendant had put his gun down. Defendant then came out
28

2

with his hands up. He followed the officers' order to lie on the ground and said. "I am your man, the gun's on the couch." The officers arrested him. At some point during these events police threw or fired tear gas canisters into the apartment.

[¶]

At trial, officers recalled details of the shot that narrowly missed Sergeant Noblett.  Jay Varney, the police chief, testified that the blinds or curtains were closed behind the window on which Noblett knocked and he could not see inside. Varney said the shots came "almost directly out of the window where [Noblett] was knocking." Noblett himself said, "[The] gunshots came out where I knocked and my face was about 12 inches to 18 inches from where the gunshots came out."  Officer Esteves agreed that the shot "hit pretty much where [Noblett] knocked."  He thought that the first volley of shots was directed at the officers because the broken glass flew toward them and the curtains came through the broken window in their direction.

There was some inconsistency in the police testimony about what Noblett did just before he knocked. Officer Esteves "believe[d]" Noblett "yelled police department" before knocking. Officer Mandrell also "believe[d] [Noblett] said police department."  Noblett's own account, however, did not include this detail:

"Q  Did anyone address the residen[ts] of that apartment in any way?
"A  Officer Esteves made an announcement for the occupants to come outside and advised we were the police.
"Q  Was there any reaction to that?
"A  No.
"Q  What, if anything, did you do once there's no reaction from the inside?
"A  I moved to the southwest corner of the front window and knocked on the window. And before I did anything else, gunshots came out the front window."

Defendant testified that, although he fired through the window after hearing the police announce themselves and after hearing the knock, he was not shooting at the officers and did not intend to harm them. He claimed he heard Noblett's voice "coming from the corner of the house" rather than from the front and that "to my knowledge, I thought no one was behind that window." He could not see the officers because the blinds were closed. He said he "lost [his] cool" and only fired "[t]o back them off, back them away."  Defendant's wife testified that defendant stood in the hallway and fired toward the front of the house, not aiming at anything in particular.

To explain what motivated his behavior, defendant testified that he was depressed. His plan was to use all his shells but one and then kill himself with the last. His answer when asked why he needed to fire many shots before killing himself was that he "wanted time to get [his] family out" and "didn't want to see [his] wife." His wife testified that she walked out of the apartment at his instruction.

Defendant testified about two causes of his depression. First, he had just been laid off from a

3

construction company job after seven or eight months, the longest he had ever continuously been employed. He had moved with his family from Madera to Chowchilla to escape gang life and had obtained this job to start making an honest living; the loss of it caused him to feel inadequate as a provider. Second, he had a conflict with his wife that day. Two days earlier, which was defendant's birthday, he had left the house and stayed out for more than a day. Defendant's wife was angry and retaliated on the day of the incident by telling defendant she had been to the hospital and learned that her five month pregnancy had miscarried. Defendant believed his disappearance on his birthday and his wife's resulting emotional state had caused the miscarriage. In reality, defendant's wife had been to the hospital, but had not miscarried. Defendant learned the truth from his mother by telephone during the standoff.

The prosecution presented evidence that pellets from the shotgun blasts struck neighboring apartments. The address of defendant's apartment was 139 Kings Avenue. It was in an apartment complex called Kings Court. Kenny Bishop lived with his wife, mother-in-law, sister-in-law, and eight-month-old daughter in the same complex in an apartment of which the address was 129 Kings Avenue; it was described at trial as catty-corner from defendant's apartment. Bishop heard the police arrive and then heard at least eight gunshots. A projectile or slug, described by a police witness as a one-ounce piece of metal fired from a shotgun shell, entered Bishop's apartment. It pierced three walls inside the apartment and ricocheted off a medicine cabinet and a bathroom door. One witness said the bedroom where the daughter was sleeping at the time was "right in the pathway" of the projectile.

Humberto Hernandez testified that he lived in the apartment at 131 Kings Avenue with his wife and brother-in-law. This apartment was described by a police witness as "directly across from" defendant's apartment. Hernandez heard the shots. Pellets from one of them broke through a window of his apartment and struck the living room wall. The three occupants took cover in the bathroom. The brother-in-law was struck near his eyebrow by a shotgun pellet or a fragment of a shotgun pellet. He was not seriously injured.

According to a police witness, the apartment at 130 North Second Street was also damaged by one of the shotgun blasts. An officer testified that he evacuated the row of apartments in which this one was included, but did not get the names of those evacuated and did not know whether people were inside each individual apartment. The prosecution also presented evidence of damage from the shotgun blasts to the windows, front door, furniture, and appliances inside defendant's apartment. Nine spent buckshot shells, one spent slug shell, and four live shells were found on the floor.

The prosecution presented evidence that defendant had been a member of the Sureno gang Vatos Locos Mexicanos, which the police gang expert described as the most violent gang in Madera County. Defendant had gang tattoos on his hands. He had admitted to being a gang member on several occasions when he was taken into custody, beginning in 1996 or 1998 and continuing to the time of his booking on the current offenses. In the past he had worn gang clothing and associated with people known to be gang members. Defendant was "very well known" as a gang member to the Madera police and Madera County juvenile authorities, having been a gang member since he was 14 or 15 years old. His gang moniker was Bones. He once told a detective he would like to have a son become a member of his gang. He

4

participated with other gang members in the flooding of jail cells and was involved in a gang meeting while in jail.

The police gang expert testified that the current offenses were committed for the benefit of or in association with the gang because gang members "gain respect" by "committing crimes[,] specifically violent acts." Killing a police officer would have given defendant "the highest status" within the gang. Further, the commission of violent crimes by members of a gang "gives that gang higher status" and causes witnesses to other gang crimes to be afraid to testify about them.

Reading from a 1999 police report, the gang expert testified about an interview defendant gave Madera police in connection with a homicide. The report said defendant "stated that the only thing that protected law enforcement, protected police officers ...was a bullet proof vest. He would—if it took—if it went down to going to jail, he would kill a police officer."

This statement was admitted over defendant's objection. The court overruled the objection and issued a limiting instruction, telling the jury that the statement was "not offered as evidence of the truth of the matter asserted" and that the jury should not "use it for any other purpose than [its] evaluation of the testimony of the expert. The court later gave a similar instruction covering all the underlying conduct upon which the expert based his opinion about defendant's gang membership.

Defendant testified that he had been a gang member in Madera but had dropped out and not been a member since he moved to Chowchilla in 2003 or 2004. He said he "[f]igured that was the best choice for me and my wife to just move out of there. I went, told my friends well, I said you know what, that's it. I am moving away. I am going to start a new life with my family, my girl, little girl."

The jury found defendant guilty as charged on counts 1 through 17. It found him not guilty on count 18, the gang-membership charge. It found all the enhancement allegations true, except the gang-enhancement allegations, which it found not true.

On count 1, attempted deliberate and premeditated murder of a police officer, the trial court sentenced defendant to 15 years to life. It added a 20-year enhancement for personal and intentional discharge of a firearm. It imposed a consecutive sentence of seven years (the upper term) on count 3, discharging a firearm at 131 Kings Avenue, and two consecutive sentences of one year and eight months (one-third of the middle term) on counts 4 and 5, discharging a firearm at 129 Kings Avenue and 130 Kings Avenue. Upper terms for count 2, assault with a firearm on a police officer, and counts 6 through 9, grossly negligent discharge of a firearm, were imposed and stayed pursuant to Penal Code section 654.2.  Concurrent upper terms were imposed for counts 10 through 15, grossly negligent discharge of a firearm, count 16, being a felon in possession of a firearm, and count 17, child endangerment.

(Exh. 1, pp. 3-10).

## **DISCUSSION**

5

I.     Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Madera County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997);  Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), cert. denied, 520 U.S. 1107 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.     Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless he can show that the state court's adjudication of his claim:

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d);  Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);  Williams v. Taylor, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams v. Taylor, 529 U.S. 326, 405-406 (2000).

1   A state court decision involves an "unreasonable application" of clearly established federal law "if the

2   state court applies [the Supreme Court's precedents] to the facts in an objectively unreasonable

3   manner."  Id., quoting Williams, 529 U.S. at 409-410; Woodford v. Visciotti, 537 U.S. 19, 24-25

4   (2002)(*per curiam*).

5          Consequently, a federal court may not grant habeas relief simply because the state court's

6   decision is incorrect or erroneous; the state court's decision must also be objectively unreasonable.

7   Wiggins v. Smith, 539 U.S. 510, 511 (2003) (citing Williams v. Taylor, 529 U.S. at 409).  In

8   Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that an

9   "unreasonable application" of federal law is an objective test that turns on "whether it is possible that

10  fairminded jurists could disagree" that the state court decision meets the standards set forth in the

11  AEDPA.  If fairminded jurists could so disagree, habeas relief is precluded.  Richter, 131 S.Ct. at 786.

12  As the United States Supreme Court has noted, AEDPA's standard of "contrary to, or involv[ing] an

13  unreasonable application of, clearly established Federal law" is "difficult to meet," because the

14  purpose of AEDPA is to ensure that federal habeas relief functions as a "'guard against extreme

15  malfunctions in the state criminal justice systems,'" and not as a means of error correction.  Richter,

16  131 S.Ct. at 786, quoting Jackson v. Virginia, 443 U.S. 307, 332, 99 S.Ct. 2781, n. 5 (1979)(Stevens,

17  J., concurring in judgment).  The Supreme Court has "said time and again that 'an *unreasonable*

18  application of federal law is different from an *incorrect* application of federal law.'"  Cullen v.

19  Pinholster, 131 S.Ct. 1388, 1410-1411 (2011).  Thus, a state prisoner seeking a writ of habeas corpus

20  from a federal court "must show that the state court's ruling on the claim being presented in federal

21  court was so lacking in justification that there was an error well understood and comprehended in

22  existing law beyond any possibility of fairminded disagreement."  Richter, 131 S.Ct. at 787-788.

23         Moreover, federal "review under § 2254(d)(1) is limited to the record that was before the state

24  court that adjudicated the claim on the merits."  Cullen, 131 S.Ct. at 1398 ("This backward-looking

25  language requires an examination of the state-court decision at the time it was made.  It follows that

26  the record under review is limited to the record in existence at the same time–i.e., the record before the

27  state court.")

28

7

The second prong of federal habeas review involves the "unreasonable determination" clause of 28 U.S.C. § 2254(d)(2).  This prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500 (when reviewing a state court's factual determinations, a "responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment").  A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Id.; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

The AEDPA also requires that considerable deference be given to a state court's factual findings.   "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. at 340.  Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v. Blodgett, 393 F.3d 943, 976-077 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state court decided the petitioner's claims on the merits but provided no reasoning for its decision, the federal habeas court conducts "an independent review of the record...to determine whether the state court [was objectively unreasonable] in its application of controlling federal law."   Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2002); see Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions."

Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).   Where the state court denied the petitioner's claims on procedural grounds or did not decide such claims on the merits, the deferential standard of the AEDPA do not apply and the federal court must review the petitioner's 's claims de novo.  Pirtle v. Morgan, 313 F.3d at 1167.

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).  Some constitutional errors, however, do not require that the petitioner demonstrate prejudice.  See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984).  Furthermore, where a habeas petition governed by the AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the Brecht standard.  Avila v. Galaza, 297 F.3d 911, 918 n. 7 (9th Cir. 2002);  Musladin v. Lamarque, 555 F.3d 830, 835 (9th Cir. 2009).

## III.  Review of Petitioner's Claims.

The instant petition itself alleges the following as grounds for relief:

I.     Reopening the case to allow the prosecutor to present additional testimony violated a state-created liberty interest.

II.    Insufficient evidence was presented to support the convictions for attempted deliberate and premeditated murder of a police officer and discharging a firearm at an inhabited building.

III.   The trial court erred in refusing to bifurcate proceedings to try the gang-enhancement allegations or by failing to sever the active-gang-membership charge for a separate trial.

IV.    The trial court erred in admitting a statement Petitioner made concerning his willingness to kill police officers.

V.     Cumulative error.

VI.    The trial court erred in failing to stay several sentencing terms in accordance with Penal

9

Code § 654.

VII.     The trial court erred in imposing the upper term sentence.

VIII.    Petitioner was deprived of the effective assistance of counsel because of trial counsel's failure to conduct a reasonable investigation.

I.       **Reopening the case to allow the prosecutor to present additional testimony violated a state-created liberty interest.**

Petitioner first contends that his state and federal rights were violated when the trial court denied Petitioner's motion for acquittal on count five and permitted the prosecution to reopen the case to recall a witness to "fill in a gap in its evidence."  Petitioner alternatively argues that his trial counsel was ineffective for "failing to save this argument for the jury."  (Ex. 1, p. 22).  These contentions are without merit.

A.   The 5th DCA's Opinion.

The 5th DCA rejected this argument as follows:

After defendant made a motion for acquittal on count 5, the court permitted the prosecution to recall a witness to fill in a gap in its evidence. Defendant argues that the court's action constituted a reopening of the prosecution's case and that it was erroneous. We disagree. The decision whether to permit the reopening of evidence is subject to the trial court's discretion. (People v. Cuccia (2002) 97 Cal.App.4th 785, 792-793.) The court's action here was within its discretion.

The discussion among the court and counsel was as follows:
"THE COURT: ... Next witness, please.

"MR. LICALSI: I have no further witnesses, Your Honor. I just have some exhibits.

"THE COURT: Why don't we do this…Why don't we take a 15- minute recess and you and Mr. Lindahl can go over the exhibits together and stipulate those ones that are admissible.

"MR. LINDAHL: All right."

The court then went into recess. According to defendant's reply brief, counsel agreed in an unreported discussion during the recess to stipulate to the admission of exhibits. The proceedings then resumed:

"THE COURT: Very well. Back on the record. And for the record, the defendant is present in court with counsel. Mr. Lindahl, I understand you wish to make a 1118.1 Motion?

"MR. LINDAHL: yes .... With regards to Count 3, 4 and 5, the 246 counts, I would ask the Court to dismiss as a matter of law in that I don't believe there's any showing that- -well, actually, let me take them separately.... [W]ith regard to Count 5, that is 130 Kings Avenue, Count 5 does allege that the discharge of a firearm was into an inhabited dwelling. There's no

10

evidence that 130 was inhabited. I am asking [for acquittal on] all three of those counts ... more specifically ... Count 5.

"THE COURT: Well, all 3 of the other apartments were inhabited.

"MR. LINDAHL: Were they?

"THE COURT: Yeah, we heard testimony to that.

"MR. LINDAHL: I don't think we heard anything with regard to apartment 130, the one located in the back, as to whether it was inhabited. I know we heard testimony regarding the occupants of 131 and 129, but I didn't recall testimony about 130 being inhabited.

"MR. LICALSI: I haven't rested yet. I will address that.

"THE COURT: All right.

"MR. LINDAHL: I am sorry. I thought that the People had rested.

"THE COURT: They were going to.

"MR. LINDAHL: When is my motion timely then?. . .

"THE COURT: All right. Then we will reserve that until Mr. LiCalsi rests."

Both counsel then informed the court of the stipulation they had reached regarding admission of exhibits. The exhibits were placed in evidence, the jury was brought back in, and the prosecutor called Sergeant Noblett back to the stand to testify about No. 130. Defendant waited until after he presented his case to renew the acquittal motion. The court denied it.

The parties preliminarily dispute whether the People had rested and whether the Court's action constituted a reopening of their case. The People argue that the prosecutor only said he had no more witnesses. Defendant asserts that the parties had already agreed on exhibits by the time he made his motion, so nothing remained but the prosecutor saying "we rest," a matter of form upon which defendant's rights should not depend. We do not need to resolve this dispute and assume that the court's action allowed the prosecutor to reopen his case. Instead, we turn to the merits of the question whether the reopening itself was an abuse of discretion.

Defendant first argues that the court's action contravened the acquittal motion statute, section 1118.1. That statute states:

> "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."

Defendant's theory is that, because section 1118.1 says the court shall enter a judgment of acquittal if the evidence is insufficient when the motion is made, "the plain language of the statute" required the court to grant his motion. This argument is in conflict with established principles. As defendant is compelled to acknowledge, trial courts are empowered to allow reopening of evidence. "It is well settled that the trial court has broad discretion to order a case reopened and allow the introduction of additional evidence." (People v. Goss (1992) 7 Cal.App.4th 702, 706.) Also, the trial court's power to vary the usual order of presentation of

11

evidence is codified in sections 1093 and 1094. To insist, as defendant does, that the court erred in this case because section 1118.1 is a "mandatory provision" ignores this discretion.

 Defendant's next theory is that defense counsel was tricked into revealing his argument (that the prosecution never proved that No. 130 was inhabited) in a way that allowed the prosecution to get the better of him. He could have saved his argument for his closing statement to the jury, but instead he "detrimentally relied" on the appearance that the prosecution had rested and on section 118.1 . As a result, his opportunity to capitalize on the prosecution's omission was squandered. He asserts that section 1118.1 should not be combined with the court's discretion to reopen to create a device for allowing the prosecution to take advantage of the defense's proper effort to obtain acquittal based on a lack of evidence on a specific point.

This "detrimental reliance" argument is based on a false premise: that if defendant had saved his argument regarding insufficient evidence on count 5 for the jury, it would then have been too late for the court to allow reopening. There is no flat rule against reopening after closing arguments have commenced. If defense counsel had saved this argument for his closing statement, the trial court's discretion would still have encompassed permission to reopen to allow the prosecutor to question Noblett, so long as the defense was offered a fair opportunity to respond. (See People v. Cuccia, supra, 97 Cal.App.4th at pp. 792-795 [court erred by allowing reopening during closing argument to allow prosecutor to offer rebuttal evidence, but it could have acted properly by also granting defendant continuance to permit presentation of surrebuttal].)

Defendant makes a similar argument contending that to allow reopening under these circumstances empowers the prosecution to put on an inadequate case and still prevail by repairing deficiencies after unfairly relying on defense counsel to point them out. He cites a federal case applying the Federal Rules of Criminal Procedure and stating that "the government's case-in-chief should not be treated as an experiment that can be cured after defendant has, by motion, identified the failures." (United States v. Hinderman (10th Cir.1980) 625 F.2d 994, 996.) There is, however, no general rule that requests to reopen must be denied to prevent the prosecution from learning how to shore up its case from the arguments supporting an acquittal motion. Instead, two principles control: First, the prosecution's failure to present the evidence before must be a mistake, not a deliberate tactic. "The court always has discretion to allow the prosecution to reopen after a section 1118 motion so long as the court is convinced that the failure to present evidence on the issue was a result of  'inadvertence or mistake on the part of the prosecutor and not from an attempt to gain a tactical advantage over [the defendant].' [Citation ]." (People v. Goss, supra, 7 Cal.App.4th at p. 708.)  Second, because the decision is committed to the trial court's discretion, it will be undisturbed on appeal unless the court acted "in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (People v. Jordan (1986) 42 Cal.3d 308, 316.)

Defendant does not argue, and the record presents no reason to believe, that the prosecutor failed to ask Noblett the relevant questions earlier through anything but inadvertence. The court was guilty of no arbitrariness or absurdity; no miscarriage of justice resulted from its ruling. Count 5 was one of three similar counts; the prosecution established each element of each count except for the "inhabited" element of count 5. By allowing the prosecution to recall Noblett, the court merely permitted the prosecution to remedy its mistake in forgetting to question its witness about that element of that count. The evidence did not come from a surprise witness and was not newly acquired to meet the argument made in the motion. Defense counsel cross-examined Noblett when he was recalled and did not request an opportunity to do anything else by way of responding to his additional testimony. In sum, just as this court held in People v. Ceja (1988) 205 Cal.App. 3d 1296, 1304 and People v. Goss, supra, 7 Cal.App.4th 702, defendant here was not prejudiced by the ruling, "'other than being denied the benefit of the prosecutor's inadvertence. '" (People v. Goss, supra, at p. 707.)

Defendant also argues that there should be a sharp distinction between a general acquittal motion and an acquittal motion based on specific asserted gaps in the prosecution's proof. Reopening following a motion based on specific gaps, he argues, allows the prosecution to take unfair advantage of the motion. Defendant concedes, however, that the case law does not establish a bright-line rule of this kind, and we see no reason to create it. The important questions are whether the prosecution's omission was inadvertent and whether there was a miscarriage of justice. These do not point to a general prohibition on reopening after an acquittal motion based on specified deficiencies.

Finally, defendant mentions, without elaboration or argument, a host of constitutional considerations:

> "The error deprived [defendant] of his liberty interest created by section 1181.1, of his interest in an exercise of discretion accorded under state law of fundamental fairness in state proceedings by virtue of his reliance on the section 1118.1 procedure, and, hence, of due process of law. (U .S. Const., amends. V, XIV; Cal. Const., art. I, §§ 7, 15; Hicks v.Oklahoma (1980) 447 U.S . 343, 346.) The error further deprived [defendant] of his constitutional rights under the state and federal double jeopardy clauses. (People v. DeSimone (1998) 62 Cal.App.4th 693,700; Jones v. Thomas (1989) 491 U.S. 376, 381.)"

We do not see how this run-of-the mill exercise of the court's discretion to control the trial proceedings implicates any of these constitutional issues. As a general rule, a defendant has no constitutional right to prevent evidence of his guilt from reaching the jury just because the prosecutor forgot to ask a witness a question before resting. This case presents nothing out of the ordinary in that regard. In light of defendant's failure to provide any significant briefing on these issues, we need go no further into the matter. (See Reyes v. Kosha (1998) 65 Cal.App.4th 451, 466, fn. 6.)

(Ex. 1, pp. 22-27).

        B.  Analysis.

              1.  Motion For Acquittal And Reopening Of Prosecution's Case.

At trial, Petitioner was charged with various counts of discharging a firearm at an inhabited dwelling.  The prosecution here, however, originally rested without offering proof that the third unit behind Petitioner's apartment (Unit No. 130) was in fact occupied.  Defense counsel made a motion for acquittal on this charge, but the trial court permitted the prosecution to recall a witness to testify that Unit No. 130 was occupied, thus satisfying the missing element of that charge.  While acknowledging that "courts retain discretion to permit the prosecution to reopen their presentation in an appropriate case," Petitioner maintains that "this is not an appropriate case" and that both of the trial court's decisions violated his liberty interest. Petitioner is mistaken.

Due process is violated only if a state evidentiary ruling was so prejudicial that it rendered the

13

1   trial arbitrary and fundamentally unfair.  <u>Parle v. Runnels</u>, 387 F.3d 1030, 1045 (9th Cir. 2004);

2   <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919 (9th Cir.1991).  Generally, a trial court has broad

3   discretion to determine the order of proof in a trial.  <u>See United States v. Goode</u>, 814 F.2d 1353, 1355

4   (9th Cir.1987) (federal trials); <u>California v. Gates</u>, 43 Cal.3d 1168, 1184 (1987) (state trials).  It is also

5   well-established that a claim of an abuse of discretion in reopening a case requires the dual

6   considerations of timeliness, <u>United States v. Bayer</u>, 331 U.S. 532, 537-539 (1947), and whether the

7   prosecution's lack of due diligence in presenting the prosecution's case in an orderly and timely

8   manner prejudiced the defendant.  <u>U.S. v. Phillips</u>, 575 F.2d 1265, 1267 (9th Cir. 1978).  Regarding the

9   latter principle, a motion to reopen a case should be made with the diligence necessary to eliminate

10  prejudice to the opposing party, or, if prejudice is unavoidable, to keep it to a minimum.  <u>Phillips</u>, 575

11  F.2d at 1267, citing <u>Fernandez v. United States</u>, 329 F.2d 899, 903 (9th Cir. 1964); and <u>Eason v.</u>

12  <u>United States</u>, 281 F.2d 818, 822 (9th Cir. 1960).

13          Here, the prosecution sought permission to present evidence that Unit No. 130 was inhabited at

14  a point when the trial court itself did not consider that the prosecution had already rested.  Although

15  the 5th DCA, for purposes of argument, assumed that the prosecution had already rested before

16  Petitioner offered his motion for acquittal, the record is far from clear.  However, regardless of

17  whether the motion to reopen occurred just before or just after the prosecution rested, there is nothing

18  in the record to suggest that the timing of the prosecution's motion prejudiced Petitioner in any way:

19  Petitioner had yet to call any witnesses or proffer any evidence so there was no interruption of the

20  defense's presentation.  The only prejudice, it would seem, was that the prosecution was permitted to

21  "cure" a potentially an evidentiary defect in the charge related to Unit No. 130.  However, it is patent

22  that, in every instance in which the prosecution seeks to reopen its case to present additional evidence,

23  the evidence subsequently presented will be for the purpose of either curing a defect in the state's case

24  or, at the least, bolstering its case at the defendant's expense.  Put another way, there is always an

25  inherent prejudice to a criminal defendant in permitting the prosecution to present additional evidence

26  of guilt.  That is not, however, the type of prejudice to which the cases on this subject speak.  As

27  mentioned above, Petitioner was not prejudiced by the timeliness of the motion.

28

14

Moreover, based on the chronology discussed above, the prosecution's motion to reopen a case was made with sufficient diligence necessary to eliminate prejudice to the opposing party, or, to the extent that prejudice was unavoidable, to keep it to a minimum.  Phillips, 575 F.2d at 1267. Accordingly, the trial court's decision to allow the prosecution to reopen its case-in-chief to introduce evidence regarding the fact that Unit No. 130 was inhabited did not render the trial fundamentally unfair.

## 2.  Ineffective Assistance of Counsel.

Petitioner next contends that, alternatively, his attorney's failure to "save" this argument for his closing argument to the jury.  Again, this contention lacks merit.

Effective assistance of appellate counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to Strickland 's two-pronged test. Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir.1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75(1988) (holding that where a defendant has been actually or constructively denied the assistance of appellate counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things. First, he must establish that appellate counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. Strickland v. Washington, 466 U.S. 668, 687-88, 104 S.Ct. 2052 (1984). Second, Petitioner must establish he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the appeal. Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir.1998).

With the passage of the AEDPA, habeas relief may only be granted if the state-court decision unreasonably applied this general Strickland standard for ineffective assistance.  Knowles v.

15

1    *Mirzayance*, 556 U.S. ___, 129 S.Ct. 1411, 1419 (2009).  Accordingly, the question "is not whether a

2    federal court believes the state court's determination under the Strickland standard "was incorrect but

3    whether that determination was unreasonable–a substantially higher threshold."  Schriro v. Landrigan,

4    550 U.S. 465, 473 (2007); Knowles v. Mirzayance, 556 U.S. ___, 129 S.Ct. at 1420.  In effect, the

5    AEDPA standard is "doubly deferential" because it requires that it be shown not only that the state

6    court determination was erroneous, but also that it was objectively unreasonable.  Yarborough v.

7    Gentry, 540 U.S. 1, 5 (2003). Moreover, because the Strickland standard is a general standard, a state

8    court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

9    See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)("[E]valuating whether a rule application was

10   unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway

11   courts have in reaching outcomes in case-by-case determinations").

12          Here, Petitioner presented his this claim as an alternative to his primary argument, i.e.,

13   allowing the prosecution to reopen its case.  The ineffective assistance claim was framed as one in

14   which, if trial counsel had failed to preserve the claim for review, counsel was ineffective.  (LD 1, p.

15   20).  The 5th DCA's opinion does not appear to directly address the issue of ineffective counsel, an

16   omission that is entirely understandable given the conditional nature of the claim, i.e., if counsel had

17   failed to preserve the claim for review.  In other words, because trial counsel had preserved the claim

18   for review, it comes as no surprise that the 5th DCA chose not to address the alternative argument.

19          However, in his petition for review in the California Supreme Court, Petitioner's ineffective

20   assistance claim morphed from an alternative argument to a contention that, strategically and

21   tactically, trial counsel should have refrained from drawing anyone's attention to the evidentiary

22   deficiency in the prosecution's case, since it was much more likely that a motion to reopen would be

23   denied if raised in closing argument than if raised at the close of the prosecution's case.  (LD 4, p. 14).

24   The state supreme court summarily denied this claim without comment.

25          Where the state court does not reach the merits of a petitioner's claim that has been properly

26   presented, there is no state court decision to which to accord AEDPA deference and, hence, the district

27   court reviews the issue de novo.  E.g., Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).  Thus,

28

reviewing de novo Petitioner's claim of ineffective assistance, the Court concludes that Petitioner has satisfied neither prong of <u>Strickland</u>.  As the 5th DCA correctly observed, given the broad discretion accorded to trial court's regarding reopening cases, even had counsel "saved" the argument until his closing argument, Petitioner would still have had no guarantee that the trial court would not have exercised its discretion to permit the prosecution to reopen the case and cure any evidentiary defect, thus nullifying any prejudice from counsel's decision to raise the issue in the motion for acquittal. Moreover, the record discloses no deficiency in counsel's performance regarding this matter. Defense counsel recognized the evidentiary defect in the state's case and made a proper and timely motion for acquittal.  Petitioner does not cite, and the Court is unaware of, any case holding that defense counsel is deficient for *refusing to forego* a valid and timely motion for acquittal in the off-chance that this might increase the likelihood that the trial court would *not* allow the prosecution to remedy the defect at a later point and, thus, essentially to "sandbag" the prosecution during closing argument.  The contention is specious on its face.

II.  <u>Insufficient Evidence Was Presented To Support The Convictions For Attempted Deliberate And Premeditated Murder Of A Police Officer And Discharging A Firearm At An Inhabited Building</u>.

Next, Petitioner contends that insufficient evidence was presented to support his convictions for attempted deliberate and premeditated murder of a police officer and discharging a firearm at an inhabited building.  These contentions are without merit.

A.  <u>The Fifth DCA's Opinion</u>.

The 5th DCA rejected Petitioner's claim as follows:

We conclude that the evidence supported findings of deliberation and premeditation as those terms are defined in the law. The jury was instructed pursuant to CALCRIM No. 601, which sets forth the definitions. The written instruction given to the jury stated:

"If you find the defendant guilty of attempted murder under Count I, you must then decide whether the People have proved the additional allegation that the attempted murder was done willfully, and with deliberation and premeditation.

"The defendant acted willfully if he intended to kill when he acted.

"The defendant deliberated if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill.

"The defendant premeditated if he decided to kill before acting.

17

"The length of time the person spends considering whether to kill docs not alone determine whether the attempted killing is deliberate and premeditated.

"The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances.

"A decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated.

"On the other hand, a cold, calculated decision to kill can be reached quickly.
"The test is the extent of the reflection, not the length of time.

"The People have the burden of proving this allegation beyond a reasonable doubt.

"If the People have not met this burden, you must find this allegation has not been proved."

This instruction has the same substance as CALJIC No. 8.67. CALJIC No. 8.67, in turn, is based on CALJIC No. 8.20, which defines deliberation and premeditation in the context of first degree murder, as opposed to attempted murder. (See Com. to CALJIC No. 8.67 (spring ed. 2007).) The definitions of deliberation and premeditation in CALJIC No. 8.20 have been upheld by our Supreme Court and by this and other Courts of Appeal. (People v. Lucera (1988) 44 Ca1.3d 1006, 1021; People v. Fonville (1973) 35 Cal.App.3d 693,705 ; People v. Goldbach (1972) 27 Cal.App.3d 563, 569.) Defendant has not argued that the jury was instructed incorrectly.

The evidence was sufficient to show deliberation and premeditation. Officer Mendoza testified that he interviewed defendant's wife after defendant's arrest. According to Mendoza, it was she who first saw the officers arriving. She told defendant the police were surrounding the apartment. Defendant got up and reached for his gun. According to his own testimony, defendant heard the police announce themselves and fired after he heard their knock. The shot emerged from the window near the point at which Noblett knocked. Defendant followed up quickly with several more shots in the same direction, each of which required him to operate the pump action on the shotgun to eject the spent shell from the previous shot. From this evidence, the jury could reasonably infer that defendant armed himself because he was surrounded by police, and, when he heard the knock, considered the consequences and made up his mind to kill the officer who did the knocking by firing repeatedly at the place from which the sound had emanated. In considering the point of this behavior- defendant's motive- the jury reasonably could have drawn the same inference the trial judge drew at the sentencing hearing: "[T]here's no other explanation for what he did other than he was contemplating suicide ... by cop. And he was going to take a cop with him." Deliberation and premeditation, as defined in the law, require no more than this.

Defendant relies on People v. Anderson (1968) 70 Cal.2d 15, 24-31, which examined some types of circumstances in which deliberation and premeditation properly are found to exist. In Anderson, which involved first degree murder, the court described three types of evidence that are relevant to deliberation and premeditation: (1) facts about "'planning' activity." i.e., about the defendant's activities before the killing indicating an intention to kill later; (2) facts about the defendant's prior relationship with the victim from which a motive could be inferred; and (3) facts about the manner of the killing that indicate a preconceived design to kill. (Id. at pp. 26-27.) The court stated:

"Analysis of the cases will show that this court sustains verdicts of first degree murder

18

[requiring a finding of deliberation and premeditation] typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (People v. Anderson. supra, 70 Cal.2d at p. 27.)

Defendant argues that the evidence in this case did not fit the pattern described in Anderson. There was no "extremely strong" evidence of planning, since events developed quickly; defendant had no prior relationship with the victim; and the manner of the attempted killing pointed to no design conceived earlier than the arrival of the police.

Our Supreme Court has made it clear, however, that the pattern described in Anderson is not a necessary condition for a finding of deliberation and premeditation.

"The Anderson analysis was intended only as a framework to aid in appellate review; it did not propose to define the elements of first degree murder or alter the substantive law of murder in any way. [Citation.] Nor did Anderson change the traditional standards of appellate review that we have set forth above. The Anderson guidelines are descriptive, not nonnative. [Citation.] The goal of Anderson was to aid reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse. [Citation.]

"In identifying categories of evidence bearing on premeditation and deliberation, Anderson did not purport to establish an exhaustive list that would exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation. [Citation.]" (People v. Perez (1992) 2 Cal.4th II 17, 1125.)

Like the Perez court, we conclude that the evidence was sufficient without attempting to fit it precisely to the Anderson guidelines. Here, as there, "though the evidence is admittedly not overwhelming, it is sufficient to sustain the jury's finding." (People v. Perez. supra, 2 Cal.4th at p. 1127.)

(Ex. 1, pp. 11-14).

          B.  Analysis.

               1.  Law On Sufficiency Of The Evidence.

     The law on sufficiency of the evidence is clearly established by the United States Supreme Court.  Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307, the test on habeas review to determine whether a factual finding is fairly supported by the record is as follows:

          "[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).  Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be

19

1    entitled to habeas relief.  Jackson, 443 U.S. at 324.   Sufficiency claims are judged by the elements

2    defined by state law.  Id. at 324, n. 16.

3          A federal court reviewing collaterally a state court conviction does not determine whether it is

4    satisfied that the evidence established guilt beyond a reasonable doubt.  Payne v. Borg, 982 F.2d 335,

5    338 (9th Cir. 1992).  The federal court "determines only whether, 'after viewing the evidence in the

6    light most favorable to the prosecution, any rational trier of fact could have found the essential

7    elements of the crimes beyond a reasonable doubt.'"  See id., quoting Jackson, 443 U.S. at 319.  Only

8    where no rational trier of fact could have found proof of guilt beyond a reasonable doubt may the writ

9    be granted.  See Jackson, 443 U.S. at 324; Payne, 982 F.2d at 338.

10          If confronted by a record that supports conflicting inferences, a federal habeas court "must

11   presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such

12   conflicts in favor of the prosecution, and must defer to that resolution."  Jackson, 443 U.S. at 326.  A

13   jury's credibility determinations are therefore entitled to near-total deference.  Bruce v. Terhune, 376

14   F.3d 950, 957 (9th Cir. 2004).  Except in the most exceptional of circumstances, Jackson does not

15   permit a federal court to revisit credibility determinations.  See id. at 957-958.

16          Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a

17   conviction.  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).  However, mere suspicion and

18   speculation cannot support logical inferences.  Id.; see, e.g., Juan H. v. Allen, 408 F.3d 1262, 1278-

19   1279 (9th Cir. 2005)(only speculation supported conviction for first degree murder under theory of

20   aiding and abetting).

21          After the enactment of the AEDPA, a federal habeas court must apply the standards of Jackson

22   with an additional layer of deference.  Juan H., 408 F.3d at 1274.  Generally, a federal habeas court

23   must ask whether the operative state court decision reflected an unreasonable application of Jackson

24   and Winship to the facts of the case.  Id. at 1275.[1]

---

[1]Prior to Juan H., the Ninth Circuit had expressly left open the question of whether 28 U.S.C. 2254(d) requires an additional degree of deference to a state court's resolution of sufficiency of the evidence claims.  See Chein v. Shumsky, 373 F.3d 978, 983 (9th Cir. 2004); Garcia v. Carey, 395 F.3d 1099, 1102 (9th Cir. 2005).

Moreover, in applying the AEDPA's deferential standard of review, this Court must also presume the correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459, 106 S.Ct. 2616 (1986).  This presumption of correctness applies to state appellate determinations of fact as well as those of the state trial courts.  Tinsley v. Borg, 895 F.2d 520, 525 (9th Cir.1990).  Although the presumption of correctness does not apply to state court determinations of legal questions or mixed questions of law and fact, the facts as found by the state court underlying those determinations are entitled to the presumption.  Sumner v. Mata, 455 U.S. 539, 597, 102 S.Ct. 1198 (1981).

Recently, in Cavazos, v. Smith, __U.S. __, 132 S.Ct. 2 (2011), the United States Supreme Court further explained the highly deferential standard of review in habeas proceedings, by noting that Jackson,

> "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable." Renico v. Lett, 559 U.S. ——, ——, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010) (internal quotation marks omitted).
>
> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

Cavazos, 132 S.Ct. at 3.

> "Jackson says that evidence is sufficient to support a conviction so long as 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'  443 U.S., at 319, 99 S.Ct. 2781.  It also unambiguously instructs that a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id., at 326, 99 S.Ct. 2781.

Cavazos, 132 S.Ct. at 6.

## 2. Sufficient Evidence To Support Attempted Murder.

Petitioner argues that insufficient evidence was presented that Petitioner acted with premeditation and deliberation in shooting at police officers.  (Doc. 1, p. 4).  Petitioner argues that

there was no evidence of planning involved in the crime and that there was no "preconceived motive to kill…" (LD 1, pp. 23-28). Petitioner is mistaken.

As discussed in the jury instruction, Petitioner acted with *deliberation* "if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill." (Ex. 1, p. 10). Petitioner acted with *premeditation* if "he decided to kill before acting." (Id.). In finding that both premeditation and deliberation were present, the 5th DCA noted that when Petitioner's wife informed him that police were outside the home, he immediately reached for his gun and fired it after police announced themselves and knocked on Petitioner's door. The bullet Petitioner fired emerged near the location where the officer had knocked on the door, and that shot was quickly followed by several more in the same direction. To fire his weapon, Petitioner had to pump the shotgun to eject the spent shell first. The jury was instructed that a "cold, calculated decision to kill can be reached quickly." (Id.). This evidence is sufficient to show that Petitioner decided to kill before acting and weighted the considerations, thus constituting both deliberation and premeditation. Regarding motive, even if the jury accepted that Petitioner was trying to commit "suicide by cop," the evidence still supports a finding that Petitioner intended to kill a police officer in the process. From the foregoing, a juror could reasonably have concluded that Petitioner had the requisite premeditation and deliberation to be convicted of attempted murder of a police officer.

### 3. Sufficient Evidence Of Discharging A Firearm.

Petitioner argues that insufficient evidence was presented to sustain a conviction for discharging a firearm at an inhabited dwelling. Petitioner contends that, although this is a general intent crime, California law nevertheless requires a malicious shooting "at" a dwelling, a fact that, Petitioner maintains, is lacking in the prosecution's case. (Doc. 1, p. 31). It appears that Petitioner is arguing that when he fired the weapon, he was simply and negligently discharging it without specifically aiming at a particular dwelling. Indeed, in his brief in the 5th DCA he argues that he did not "even see other units, much less consciously consider them." (LD 1, p. 30). Petitioner's claim is without merit.

To convict a defendant of discharging a firearm at an inhabited dwelling, the prosecution must

show that the perpetrator "maliciously and willfully" discharged the firearm at an inhabited dwelling. (Cal. Pen. Code § 246).   As the 5th DCA pointed out, the fact that Petitioner could not see the other units through his drawn blinds, or that he was using a sawed-off barrel from within the house, does not diminish the fact that he knew other apartment units were nearby and that he might well hit one of those units if he discharged his weapon.  Those findings, and the fact that Petitioner consciously disregarded this risk when he opened fire, were all that a jury was required to find in order to sustain a conviction on this charge.  The evidence was sufficient for such findings.  Thus, the state court's adjudication on this point was neither contrary to nor an unreasonable application of clearly established federal law.

III. <u>The Trial Court Erred In Refusing To Bifurcate Proceedings To Try The Gang-Enhancement Allegations Or By Failing To Sever The Active Gang Membership Charge For A Separate Trial</u>

Petitioner next argues that the trial court erred in refusing to bifurcate the proceedings in order to try the gang-enhancement allegations separately or by refusing to sever the active gang membership charge from the rest of the proceedings.  These contentions, too, are without merit.

A. <u>The 5th DCA's Decision.</u>

In its decision, the 5th DCA rejected Petitioner claim as follows:

Defendant contends that the tri al court committed reversible error by failing to use a bifurcated proceeding to try the gang-enhancement allegations and by failing to sever the active-gang-membership charge for a separate trial. We disagree.

At trial, during discussion of motions in limine, defense counsel and the trial court had the following conversation on this subject:

"MR. LINDAHL: 1 would move--ask the Court to bifurcate the portion which deals with the [section] 186.22 allegation [that the crimes were committed to benefit a criminal street gang] based primarily upon the <u>Killabrew</u> decision.  I just feel that the chance for prejudice in the jury weighing the underlying facts would outweigh its probative value. I would ask the Court—

"THE COURT: All right. Well, I never thought about it because of the other charges here-- these gang allegations are really basically insignificant and would not unduly prejudice Mr. Ramirez, considering what happened. And I heard the preliminary hearing.  But in any event, it is charged as a special allegation [in] 16 counts and it's actually charged [as a substantive offense] in Count 18, so it would be—

"MR. LINDAHL: Obviously, I won't ask the Court to bifurcate the stand alone count, just the allegations in the other—

"THE COURT: Right. So I don't see any undue prejudice to Mr. Ramirez in this case because we litigate those issues in one trial. Anything else?

"MR LINDAHL: No."

In substance, this discussion touched on both bifurcation and severance. Bifurcation delays presentation to the jury of matters- such as prior convictions or gang-enhancement allegations--that may be inflammatory and that can be treated separately from guilt or innocence on substantive charges. In a bifurcated proceeding, evidence on these matters is presented to the same jury after it has found the defendant guilty of the charges. (People v. Calderon (1994) 9 Cal.4th 69, 74.) On the other hand, severance of charges involves ordering separate trials for different charges or groups of charges. (§ 954)

Bifurcation of gang-enhancement allegations may be appropriate where the evidence supporting the allegations is highly inflammatory and not intel1wined with the evidence of the charged offenses, (People v, Hernandez (2004) 33 Cal.4th 1040, 1049; People v. Martin (1994) 23 Cal.App.4th 76, 81-82.) We review the trial court's decision on a request to bifurcate for an abuse of discretion. (People v. Calderon, supra, 9 Cal.4th at pp. 69, 72, 77-78.) In this case, the evidence supporting the gang-enhancement allegations was virtually identical to the evidence supporting one of the charged offenses, namely the offense of being an active member of a criminal street gang as charged in count 18.  The trial court's comments reflect that it denied the request for bifurcation for this reason. In doing so, it did not abuse its discretion.

Defendant argues that the court should have handled the matter by severing count 18 so there would be no connection between the evidence of the underlying offenses and the evidence supporting the gang-enhancement allegations.  He asserts that if the severance claim is not preserved for appellate review because defense counsel did not request severance at trial, then defense counsel rendered ineffective assistance by failing to request it.

We agree with the People's argument that defendant waived his severance claim by expressly disclaiming at trial any wish to separate count 18 from the rest of the trial. Failure to request severance waives the matter on appeal. (People v. Hawkins (1995) 10 Cal.4th 920, 939-940, overruled on other grounds by People v. Lasko (2000) 23 Cal.4th 101, 110; People v. Daly (1992) 8 Cal.App. 4th 47, 54, fn. 6.)

Defense counsel's decision not to make this request was not ineffective assistance. Assuming that a reasonably professional level of performance would have included this request, defendant cannot show that there was a reasonable probability of a better outcome for him if it had been made. (Strickland v. Washington, supra, 466 U.S. at pp. 688, 694.)

First, we review the denial of a request for severance of charges for abuse of discretion. (People v. Bradford (1997) 15 Cal.4th 1229, 1318.)  Defendant does not contend that count 18 improperly was joined with the other charges pursuant to section 954.  As a result, the only

question is whether the court would have abused its discretion by denying a request for severance.  (People v. Daly, supra, 8 Cal.App. 4th at p. 55.)  The Supreme Court has described four factors that are significant in reviewing the denial of a request for severance: (1) whether evidence supporting one joined charge is cross-admissible with respect to another; (2) whether evidence supporting one joined charge is highly inflammatory as to another; (3) whether the prosecution has joined a weak charge with a stronger one in the hope of a spillover effect; and (4) whether the death penalty is sought. (People v. Balderas (1985) 41 Cal.3d 144, 173.) All the factors are relevant and the fact that some may favor severance does not mean the trial court necessarily lacks discretion to deny severance based on others, (Frank v, Superior Court (1989) 48 Cal.3d 632, 641; People v. Daly, supra, 8 Cal.App.4th at p. 55.)  In this case, there might not have been much evidence that was cross-admissible between count 18 and the other counts (except with respect to the gang enhancements to the other counts, which defendant claims also should have been tried separately); count 18 may have been weaker than the other counts; and the death penalty is not at issue. On the other hand, the gang evidence was not highly inflammatory with respect to the other charges.

Second, even if the trial court had granted severance and both the gang charge and the gang-enhancement allegations had been separated from the rest of the trial, there is no reasonable likelihood of a better result for defendant. Defendant argues that this was a "close intent case" with respect to counts 1 and 3 through 5, and that the gang evidence could have persuaded the jury of defendant's bad character and could have given the jury the push it needed to find the necessary mental state. We do not think so. As explained in the discussion about the 1999 statement above, it is not reasonably probable that defendant would have obtained a different result if that portion of the gang evidence had been excluded. The remaining gang evidence is no different in this regard. Further, because the jury found the gang allegations not true and found defendant not guilty of the gang charge, there is little likelihood that its exposure to the gang evidence significantly influenced its verdict and findings on the remainder of the information.

Finally, the evidence that defendant heard the police announce themselves and knock then pointed his gun at the window they knocked on and fired repeatedly, provided strong support for the inference that he had the necessary mental state, In light of this, defendant cannot show that the jury's exposure to the gang evidence prejudiced him.

For these reasons, there was no reversible error in the court's decision not to bifurcate the gang-enhancement allegations or in the fact that it did not sever count18 sua sponte; and trial counsel did not render ineffective assistance by failing to request severance.

(Ex. 1, pp. 18-21).

    B.  Analysis.

    As correctly argued by Respondent, there is no clearly established Federal law which holds that joinder or consolidation of charges may violate the Constitution. In United States v. Lane, 474 U.S. 438, 446 n. 8, 106 S.Ct. 725 (1986), the Supreme Court stated in a footnote that "[i]mproper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a

1  constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth

2  Amendment right to a fair trial."  However, in Young v. Pliler, the Ninth Circuit noted:

3
   > Lane considered only the effect of misjoinder under Federal Rule of Criminal Procedure 8, and
4  > expressly stated that no constitutional claim had been presented. See Lane, 474 U.S. 438, 446
   > & n. 9, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986). Thus, Lane's broad statement-found in a
5  > footnote without citation to any legal authority-that misjoinder could only rise to the level of a
   > constitutional violation if it was so prejudicial as to violate due process, was probably dictum.
6  > Only Supreme Court holdings are controlling when reviewing state court holdings under 28
   > U.S.C. § 2254; Court dicta and circuit court authority may not provide the basis for granting
7  > habeas relief. Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S.Ct. 1166, 155 L.Ed.2d 144
   > (2003).

8  Young, 273 Fed.Appx. 670, n. 1, 2008 WL 1757564 (9th Cir.2008) (unpublished); see also Collins v.

9  Runnels, 603 F.3d 1127, 1132–33 (9th Cir.2010).

10         In ascertaining what is "clearly established Federal law," this Court must look to the "holdings,

11  as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court

12  decision." Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under §

13  2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the

14  state court renders its decision." Id.  Given that there is no clearly established Federal law in this

15  instance, the Court cannot grant relief, since habeas relief is triggered only when the state court

16  adjudication runs afoul of clearly established federal law.

17         However, even assuming, arguendo, that the Supreme Court's footnote could be considered

18  clearly established Federal law, no constitutional violation occurred in this case.  "Improper joinder

19  does not, in itself, violate the Constitution.  Rather, misjoinder would rise to the level of a

20  constitutional violation only if it results in prejudice so great as to deny a defendant his right to a fair

21  trial." Lane, 474 U.S. 438, 446, fn. 8.  Joinder of offenses results in a constitutional violation only if it

22  renders a state trial unfair and violates due process.  Herring v. Meachum, 11 F.3d 374, 377 (2nd Cir.

23  1993).  A defendant must show that actual prejudice resulted from the events as they unfolded during

24  trial.  Herring, supra, 11 F.3d at 378, citing Opper v. U.S., 348 U.S. 84, 94-95 (1954).  This prejudice

25  is shown if the impermissible joinder had a substantial and injurious effect or influence in determining

26  the jury's verdict.  See Bean v. Calderon, 163 F.3d 1073, 1086 (9th Cir.1998); see also, Spencer v.

27  Texas, 385 U.S. 554, 562 (1967) (while some prejudice may flow from joinder of offenses in criminal

28

offenses, the risk is justified by convenience and guarded against by limiting instructions);

Featherstone v. Estelle, 948 F.2d 1497, 1503 (9th Cir. 1991) (consolidation rests in the sound

discretion of the state trial court).

In the instant case, Petitioner's counsel moved to sever the gang enhancements, but not the

substantive active-gang-membership charge. The trial judge pointed out that the gang enhancements

were "basically insignificant" when compared to the serious substantive charges and that the one

gang-related substantive charge was not subject to bifurcation, which Petitioner's counsel

acknowledged. As the 5th DCA pointed out, the evidence presented for the enhancements was

virtually identical to the evidence presented on the substantive gang charge, and the jury found the

gang enhancements not to be true and also found Petitioner not guilty of the substantive gang charge.

These circumstances establish that joinder did not prejudice Petitioner in the eyes of the jury. And, as

Respondent correctly observes, even if some technical violation occurred in joinder of the various

enhancements and charges, the error would be harmless since it could not have had "a substantial and

injurious effect or influence in determining the jury's verdict" for the reasons set forth above. Brecht

v. Abrahamson, 507 U.S. 619, 637-38 (1993).

Additionally, even were the foregoing not true, to the extent that Petitioner is arguing that the

substantive gang count should have been severed, that claim is procedurally barred because Petitioner

failed to make a timely request to sever. Federal courts "will not review a question of federal law

decided by a state court if the decision of that court rests on a state law ground that is independent of

the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722,

729, 111 S.Ct. 2546 (1991); LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001); see Ylst v.

Nunnemaker, 501 U.S. 797, 801 (1991); Park v. California, 202 F.3d 1146, 1150 (2000) ("A district

court properly refuses to reach the merits of a habeas petition if the petitioner has defaulted on the

particular state's procedural requirements . . . ."); see also Fox Film Corp. v. Muller, 296 U.S. 207,

210 (1935). This concept has been commonly referred to as the procedural default doctrine. This

doctrine of procedural default is based on concerns of comity and federalism. Coleman, 501 U.S. at

730-32. If the court finds an independent and adequate state procedural ground, "federal habeas

review is barred unless the prisoner can demonstrate cause for the procedural default and actual

prejudice, or demonstrate that the failure to consider the claims will result in a fundamental

miscarriage of justice." Noltie v. Peterson, 9 F.3d 802, 804-805 (9th Cir. 1993); Coleman, 501 U.S. at

750; Park v. California, 202 F.3d 1146, 1150 (9th Cir. 2000).

The mere occurrence, however, of a procedural default will not necessarily bar a federal court

from reviewing claims in a petition for writ of habeas corpus.  In order for the procedural default

doctrine to apply and thereby bar federal review, the state court determination of default must be

grounded in state law that is both *adequate* to support the judgment and *independent* of federal law.

Ylst, 501 U.S. at 801;  Coleman, 501 U.S. at 729-30; see also Fox Film Corp., 296 U.S. at 210.  Put

another way, the procedural default doctrine will apply only if the application of the state procedural

rule provides "an adequate and independent state law basis" on which the state court can deny relief.

Park, 202 F.3d at 1151, *quoting*, Coleman, 501 U.S. at 729-30.

"For a state procedural rule to be 'independent,' the state law basis for the decision must

not be interwoven with federal law." LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001) (*citing*

Michigan v. Long, 463 U.S. 1032, 1040-41, 103 S.Ct. 3469 (1983)); Morales v. Calderon, 85 F.3d

1387, 1393 (9th Cir. 1996) ("Federal habeas review is not barred if the state decision 'fairly appears to

rest primarily on federal law, or to be interwoven with federal law.'" (*quoting* Coleman, 501 U.S. at

735, 111 S.Ct. 2456)).  "A state law is so interwoven if 'the state has made application of the

procedural bar depend on an antecedent ruling on federal law [such as] the determination of whether

federal constitutional error has been committed.'" Park, 202 F.3d at 1152 (*quoting* Ake v. Oklahoma,

470 U.S. 68, 75, 105 S.Ct. 1087 (1985)).

To be deemed adequate, the state law ground for decision must be well-established and

consistently applied. Poland v. Stewart, 169 F.3d 573, 577 (9th Cir. 1999) ("A state procedural rule

constitutes an adequate bar to federal court review if it was 'firmly established and regularly followed'

at the time it was applied by the state court.")(*quoting* Ford v. Georgia, 498 U.S. 411, 424, 111 S.Ct.

850 (1991)).  Although a state court's exercise of judicial discretion will not necessarily render a rule

inadequate, the discretion must entail "'the exercise of judgment according to standards that, at least

over time, can become known and understood within reasonable operating limits.'" Id. at 377 (quoting Morales, 85 F.3d at 1392).   California law requires that, with certain exceptions, appellate courts will not consider claims of error that could have been but were not raised in the trial court. Peole v. Vera, 15 Cal.4th 269, 275 (1997).  That rule has been deemed both independent of federal law, People v. Williams, 16 Cal.4th 153, 208 (1997), and consistently applied.  Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002).

Here, the record is uncontroverted that defense counsel did not tender an objection to joinder of the substantive gang count at trial.  Nothing in the record discloses any further motion by the defense in this regard.  Accordingly, Petitioner was procedurally barred from raising it in the state appellate courts and, indeed, the 5th DCA recognized this fact in its opinion.  (Ex. 1, p. 20).  However, even were the claim not barred, the 5th DCA's explanation as to why the joinder of the substantive charge with the other counts was not an abuse of discretion is not objectively unreasonable.  And, in any event, the record indicates that the error, if any was harmless because it did not have a substantial and injurious effect or influence in determining the jury's verdict.  Brecht v. Abrahamson, 507 U.S.at 623.

IV. The Trial Court Erred In Admitting A Statement Petitioner Made Concerning His Willingness To Kill Police Officers.

Petitioner argues that the trial court violated his right to due process by admitting a statement by Petitioner regarding his willingness to kill police officers.  The claim lacks merit.

A. The 5th DCA's Opinion.

As noted, the prosecution introduced evidence of defendant's 1999 statement in a police interview that he would kill a police officer if necessary to avoid going to jail. This statement was admitted to show a portion of the basis of the expert's opinions (which the jury rejected) that defendant was an active gang member and that the current offenses were committed for the benefit of his gang. The trial court overruled defendant's objection and gave a limiting instruction to the effect that the statement was not admitted for the truth of the matter asserted and could be used only to evaluate the officer's opinions. Defendant now argues that the statement was inadmissible under Evidence Code section 352. We disagree.

As a preliminary matter, we agree with the People's argument that defendant has forfeited his Evidence Code section 352 claim by failing to make an objection on the same basis at trial. In general, appellate courts need not consider erroneous rulings if objection could have been, but was not, made in the trial court. (People v. Jenkins (2000) 22 Cal.4th 900, 1000.) This general rule applies to admission of inadmissible evidence. (People v. Chain (1971) 22 Cal.App.3d 493, 497.) An objection on one ground does not preserve for appeal an objection on a different ground. (People v. Reid (1982) 133 Cal.App.3d. 354, 360-361 [relevance objection did not

29

preserve claimed error under Evid. Code. § 352].)

No exception to the requirement of objection at trial applies here. As will be seen, we are not dealing with, for instance, "inadmissible matter [that] was so seriously prejudicial that an objection would have been ineffective to remedy the harm" or with "admission of the inadmissible matter [that] ... is considered a denial of due process; e.g., involuntary confession, involuntary admission, and evidence obtained by brutality." (3 Witkin, Cal. Evidence (4th ed. 2000) Presentation at Trial, § 397, pp. 487-488.)

When Officer Mendoza began reading the report, defense counsel said, "Objection to the witness just reading the report for the record." This was, in substance, a hearsay objection and the court interpreted it that way. After the court overruled it and the statement came in, defense counsel did not make another objection or a motion to strike based on Evidence Code section 352 or anything else.

Defendant argues in his reply brief that the objection must have been based on Evidence Code section 352 because that was "the only apparent available ground for objection" and "clearly, the court understood as much .... " The record does not support this account. An objection to reading from a report is an objection to the source of a statement, not an objection to its prejudicial effect. A ruling that evidence is not admitted for the truth of the matter asserted is a ruling on a hearsay objection, not a ruling regarding prejudicial effect. Defendant never before raised the objection he raises now and has failed to preserve the issue for appellate review. (See People v. Montiel (1993) 5 Cal.4th 877, 918-919 [trial court had no sua sponte duty to exclude hearsay evidence offered to support expert testimony and claimed to be prejudicial on appeal; trial counsel's failure to act waived claim of error].)

We would not hold that there was reversible error even if there had been an adequate objection at trial. Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Defendant's claim is that the danger of undue prejudice from his 1999 statement substantially outweighed its probative value. We review an admission of evidence claimed to be inadmissible under Evidence Code section 352 for abuse of discretion. (People v. Minifie (1996) 13 Cal.4th 1055, 1070.)

The probative value of the statement was the support it provided for the expert's view that defendant was an active gang member. In the end, the jury rejected the charge in count 18 that defendant was an active gang member, but of course the prosecution was entitled to present evidence to support that charge. We have no doubt that evidence of defendant's long-term, past gang membership was relevant to the claim that he was still an active gang member. The expert reasonably could conclude that defendant's boast that he was willing to kill a police officer was characteristic of gang behavior. He was entitled to rely on inadmissible hearsay if it was a type of evidence on which experts reasonably rely. (Evid. Code, § 801, subd. (b); In re Fields (1990) 51 Cal.3d 1063, 1070.)

To satisfy the jury's need to know enough about the reasons for the expert's opinion to permit evaluation of that opinion, the prosecution properly could present the report and its contents to the jury through the expert's testimony. (People v. Montiel, supra, 5 Cal.4th at pp. 918-919.) Hearsay problems may arise under circumstances like these, but "[m]ost often, [these] problems will be cured by an instruction that matters admitted through an expert go only to the basis of his opinion and should not be considered for their truth," like the instruction given here. (Id. at p. 919.)

The claimed prejudicial effect is that, because the statement asserted a willingness to do that which defendant was charged with attempting to do in the present case, the jury was

encouraged to violate the rule against using character evidence as proof of conduct on a specific occasion. (Evid. Code, § 1101.) We acknowledge that there was a risk this could happen, but do not think that risk required the trial court to exclude the evidence. If the proper objection had been made, the question for the court would have been whether the danger of a prejudicial effect substantially outweighed the probative value of the statement. Without exceeding the bounds of reason, the court could have concluded that it did not. One reason why it could have done so is that it gave a limiting instruction. Jurors are generally presumed to follow instructions. (People v. Yeoman (2003) 31 Cal. 4th 93, 139.) Another reason is that the statement was not directly supportive of a character to act as defendant acted. There is little likelihood that he tried to kill the officer who knocked as a means of avoiding prison. He knew he was surrounded. He did not attempt, and likely did not contemplate, escape. His own account was that he wanted to die.

Contrary to defendant's argument, defense counsel's failure to make an Evidence Code section 352 objection was not ineffective assistance of counsel. Assuming that a reasonably professional level of performance would have included this objection, defendant cannot show that there was a reasonable probability of a better outcome for him if it had been made. (Strickland v. Washington (1984) 466 U.S. 668, 688, 694.) First, as we have just said, the court would have acted within its discretion in overruling this objection.

Second, defendant cannot show a reasonable probability of a different outcome even if the objection had been made and sustained. The risk that the statement would have a prejudicial effect was not great, however, for the reasons we have just given. The verdict confirms this is true. Defendant was acquitted of being an active gang member and his conduct in committing the current offenses was found not to be for the benefit of a gang. This tends to show that the jury did not think defendant was acting from the gang mentality in his 1999 statement evidenced and diminishes the likelihood that the jury relied on the statement in finding the necessary mental state.

Finally, the evidence of defendant's mental state was strong. Defendant heard the police announce themselves and knock on the window. He picked up his gun, pointed it at the window they knocked on, and fired several times. This constituted ample support for the necessary inference regarding defendant's mental state. Relative to that, defendant's 1999 statement was not of great importance.

In sum: Defendant forfeited his Evidence Code section 352 objection to the admission of his 1999 statement by failing to make it at trial. On the merits, admission of the statement was not an abuse of discretion. Failure to make the objection did not constitute ineffective assistance of counsel.

(Ex. 1, pp. 13-18).

     B. <u>Analysis</u>.

   Initially, the Court agrees with Respondent that the claim is procedurally barred because Petitioner failed to object to the admission of this evidence at the time it was introduced. As discussed previously, California's contemporaneous objection rule is applied independent of federal law and it has been applied consistently, thus satisfying the two-pronged requirement for procedural default. It is uncontroverted that Petitioner did not object to the evidence at the time it was offered. Accordingly, Petitioner's failure to assert a timely objection means that the claim is procedurally barred.

31

However, the claim also fails on its merits.  The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of fundamental due process and the right to a fair trial.  Colley v. Sumner, 784 F.2d 984, 990 (9th Cir. 1984); Jefferies v. Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993).  State law foundational and admissibility questions raise no federal question.  Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995).  Since this ground for relief pertains to an issue of evidentiary error, Petitioner fails to raise a federal question as required for federal habeas review.

However, in Payne v. Tennessee, the Supreme Court stated that if evidence introduced at a criminal trial "is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief."  Payne, 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (citing Darden v. Wainwright, 477 U.S. 168, 170-83, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)).  Darden provides that the "relevant question" is whether admission of the challenged evidence "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  477 U.S. at 181, 106 S.Ct. 2464; Romano v. Oklahoma, 512 U.S. 1, 12, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994) ("The relevant question in this case . . . is whether the admission of evidence regarding petitioner's prior death sentence so infected the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process").

A habeas petitioner must meet his burden of showing that "absent the alleged impropriety, the verdict probably would have been different."  Harris v. Bowersox, 184 F.3d 744, 752 (8th Cir. 1999).  "He must show that the alleged error rendered the entire trial fundamentally unfair - - that there is a reasonable probability that the error complained of affected the outcome of the trial - - i.e., that absent the alleged impropriety, the verdict probably would have been different."  Carter v. Armontrout, 929 F.2d 1294, 1296 (8th Cir. 1991).  Habeas relief is only available if the alleged error "fatally infected the trial" and deprived a petitioner of "the fundamental fairness which is the essence of due process."  Mercer v. Armontrout, 844 F.2d 582, 587 (8th Cir. 1988).

Petitioner cannot meet that stern test.  First, as discussed comprehensively in the 5th DCA's

1    decision, the 1999 statement was admissible on the substantive gang charge because jurors could

2    reasonably conclude that if Petitioner had evidenced a willingness to kill police officers in the past, in

3    order to avoid going to jail, he could continue to believe that at the time of the crimes.  This would, in

4    turn, tend to support the gang expert's opinion that Petitioner was actively involved in a gang and

5    acted on behalf of the gang, as well as independent proof of both the gang enhancements and the

6    substantive gang charge.  Perhaps most importantly, though, is the simple fact that the jury rejected the

7    prosecution's claim that Petitioner was still an active gang member by acquitting him of that

8    substantive charge, despite evidence of the 1999 statement.  Given the obvious lack of prejudice in

9    admitting the 1999 statement, Petitioner simply cannot make a showing that its admission made the

10   trial "fundamentally unfair" or that it affected the outcome of the trial.  Thus, the state court's

11   adjudication of this issue was not objectively unreasonable.

12        V.   Cumulative Error.

13        Petitioner next argues that the cumulative error inherent in the seven substantive claims raised

14   in the petition justify granting habeas relief.  Petitioner is mistaken.

15        The cumulative prejudicial effect of multiple trial errors must be considered in determining

16   whether habeas relief is warranted.  28 U.S.C. § 2254.  Phillips v. Woodford, 267 F.3d 966, 985 (9th

17   Cir. 2001).  Here, however, as discussed above, there are no constitutional errors to accumulate.  See

18   Villafurerte v. Stewart, 111 F.3d 616, 632 (9th Cir. 1997)(per curiam).  In analyzing prejudice in a case

19   in which it is questionable whether any "single trial error examined in isolation is sufficiently

20   prejudicial to warrant reversal," the Ninth Circuit has recognized the important of considering the

21   "cumulative effect of multiple errors" and not simply conducting a "balkanized, issue-by-issue

22   harmless error review."  United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996); see also

23   Whelchel v. Washington, 232 F.3d 1197, 1124 (9th Cir. 2000)(noting that cumulative error applies on

24   habeas review); Matlock v. Rose, 731 F.2d 1236, 1244 (6th Cir. 1984)("Errors that might not be so

25   prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively

26   produce a trial setting that is fundamentally unfair.").

27        "Multiple errors, even if harmless individually, may entitle a petitioner to habeas relief if their

28

33

cumulative effect prejudiced the defendant." Ceja v. Stewart, 97 F. 3d 1246, 1254 (9th Cir. 1996),

citing Mak v. Blodgett, 970 F.2d 614, 622 (9th Cir. 1992). "Although no single alleged error may

warrant habeas corpus relief, the cumulative effect of errors may deprive a petitioner of the due

process right to a fair trial." Karis v. Calderon, 283 F.3d 1117, 1132 (9th Cir. 2002). However, the

Ninth Circuit has also recognized that where there is no single constitutional error, nothing can

accumulate to the level of a constitutional violation. See Rup v. Wood, 93 F.3d 1434, 1445 (9th Cir.

1996). Here, as discussed both supra and infra, no error occurred; hence, there can be no cumulative

error justifying habeas relief.

VI. The Trial Court Erred In Failing To Stay Several Sentencing Terms In Accordance With Penal Code § 654.

Petitioner also contends that the trial court erred in refusing to stay several of his prison terms

in accordance with Cal. Pen. Code § 654. As with the other claims, this one also lacks merit.

A. The 5th DCA's Decision.

The appellate court rejected Petitioner's sentencing arguments with the following explanation:

A. Section 654

1. Counts 3 through 5 and 10 through 15

Pursuant to section 654, the trial court stayed the sentences on counts 6 through 9 (negligent discharge of a firearm). It did not stay the sentences on counts 3 through 5 (firing at an inhabited dwelling) or 10 through 15 (negligent discharge of a firearm). Defendant contends that the court should have stayed the sentences for all these counts because he fired the shotgun pursuant to a single criminal objective, "namely attempted murder or assault on a peace officer." We disagree. Section 654 does not require a stay where multiple offenses arising from a course of conduct with a single criminal objective had separate victims.

Section 654 provides, in part, as follows:

"An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

This statute bars multiple punishment not only for a single criminal act but for a single indivisible course of conduct in which the defendant had only one criminal intent or objective. (People v. Bauer (1969) 1 Cal.3d 368, 376; In re Ward (1966) 64 Cal.2d 672, 675-676; Neal v. State of California (1960) 55 Cal.2d 11, 19.) We review under the substantial-evidence standard the court's factual finding, implicit or explicit, of whether or not there was a single criminal act or a course of conduct with a single criminal objective. (People v. Coleman (1989) 48 Cal.3d 112, 162; People v. Ratcliff (1990) 223 Cal.App.3d 1401, 1408.) As always, we

review the trial court's conclusions of law de novo. (<u>Hill v. City of Long Beach</u> (1995) 33 Cal.App.4th 1684, 1687.)

In this case, we need not consider how many objectives defendant might have had in carrying out his shooting spree. There was no error even assuming the multiple convictions were based on a single objective because there were multiple victims. Section 654 does not bar multiple punishments where multiple crimes of violence arising from a single objective had separate victims. (<u>People v. Miller</u> (1977) 18 Ca1.3d 873, 885-886, overruled on other grounds in <u>People v. Oates</u> (2004) 32 Cal.4th 1048, 1067- 1068, fn. 8; <u>People v. Young</u> (1992)  11 Cal.App.4th 1299, 1311-1312.)

The victims of defendant's shooting offenses included all the occupants of the apartments he shot who were home at the time. These included Kenny Bishop and his daughter, mother-in-law, and sister-in-law. They included Humberto Hernandez, his wife, and his brother-in-law. Defendant's victims also included all others put in harm's way by his grossly negligent shotgun discharges. These victims included the officers who surrounded his apartment during the shooting spree. Among these, the record mentions at least Sergeant Noblett, Officers Esteves and Mandrell, and Chief Varney. Noblett, Esteves, and Varney were at the front of the apartment when the shooting started; Mandrell had gone with a police dog to the back. As noted earlier, defendant knew he was surrounded and shots emerged from both front and back windows. There was evidence of shotgun damage inside defendant's apartment as well, indicating that defendant's wife and daughter were also endangered by the shooting. The daughter was also outside the apartment with the police during part of the standoff. All told, there were at least 13 victims of defendant's shooting offenses. To these might be added the California Highway Patrol officers who came to the scene to provide support. The court imposed unstayed sentences on a total of 12 counts (1, 3 through 5, and 10 through 17). Assuming the acts on which all of these were based were undertaken pursuant to a single criminal objective, imposition of unstayed sentences for each was still proper.

Defendant apparently believes the multiple-victim doctrine only applies if multiple victims received bodily injuries. He argues:

> "[T]here were no separate human victims of violence alleged or found true as to Counts 3-5, as required for this exception, only apartment numbers. [Citations.] At a minimum, in applying this exception the courts consider the actual means employed in committing the offenses under the circumstances, as well as the existence of actual victims of violence to the person. [Citation.] Under this analysis, [defendant] submits this is very different than an intentional shooting at a car or the like. [Defendant] should not be held liable for discrete victims of violence for pellet strikes on these three apartments, based on what amounts to reckless conduct, any more than if ricochets had happened to hit a few more apartments; at best, the evidence would support one additional term under Count 3 for the ricochet wound suffered by Eloy Perea."

This argument represents a misunderstanding of the multiple-victim doctrine. <u>People v. Cruz</u> (1995) 38 Cal.App.4th 427 well illustrates a proper interpretation of this doctrine.  Having been expelled by a security guard from a swap meet in a building, Cruz returned with a gun and fired four shots at the guard though a glass door. One shot missed by inches. Several other people were standing near the door. (<u>Id.</u> at pp. 430-431.) Cruz was convicted of, and received separate unstayed sentences for, assault with a firearm and firing at an occupied building. (<u>Id.</u> at pp. 430, 434.) The Court of Appeal held that there was no violation of section 654 because there were multiple victims. The guard, "although uninjured, was a victim of both crimes. He was not, however, the only victim of the second crime [firing at an occupied building]. The 'children and other people' standing near [the guard]... as the bullets shattered the glass front door, were at risk from bullets and flying glass. They too were 'victims.'  Appellant was

properly punished for his crime against them." (People v. Cruz, supra, at p. 434.) Cruz was correctly decided and is comparable to this case.

     2. Count 16

Defendant received an unstayed sentence for count 16, being a felon in possession of a firearm. He argues that section 654 required staying this sentence because there was no evidence that he possessed the shotgun before the shooting spree. We disagree.

Defendant's position is based on the doctrine set forth in People v. Venegas (1970) 10 Cal.App.3d 814. There, the defendant was convicted of assault with a deadly weapon with intent to commit murder and possession of a firearm by a convicted felon. He received a prison sentence for each count. (Id. at p. 817.) The Court of Appeal held that there was only one act of possessing the weapon, so the felon-in-possession offense was not a "divisible transaction" from the assault. "[W]here the evidence shows a possession distinctly antecedent and separate from the primary offense, punishment on both crimes has been approved," the court stated. But "[h]ere the evidence shows a possession only at the time defendant shot" the victim. As a result, imposition of sentence on both counts "constituted multiple punishment proscribed by section 654." (Id. at p. 821.) The Supreme Court endorsed Venegas in People v. Bradford (1976) 17 Cal.3d 8, 22-2.

Questions under the doctrine of Venegas can be close. In People v. Bradford, supra, 17 Ca1.3d 8, for instance, the defendant was convicted of and sentenced for assault with a deadly weapon and being a felon in possession of a firearm. He obtained the deadly weapon by wresting it from the victim, a police officer, and then proceeded to fire it at him. (Id. at p. 13.) The Supreme Court held that there was no possession antecedent to and separate from the assault, so section 654 required one of the sentences to be stayed. (People v. Bradford, supra, at pp. 22-23.) In People v. Ratcliffe, supra, 223 Cal.App.3d 1401, the opposite result was reached. The defendant committed two robberies about 90 minutes apart and was arrested 30 minutes after the second robbery. He received sentence enhancements for being armed with a firearm in the commission of each robbery. He was also convicted of and received an additional sentence for being a felon in possession of a firearm . (Id. at pp. 1404-1405, 1407-1408.) The Court of Appeal rejected his argument that imposing sentences for both being armed during the offenses and being a felon in possession of a firearm violated section 654. Noting that the crime of being a felon in possession of a firearm "is committed the instant the felon in any way has a firearm within his control" (People v. Ratcliff, supra, at p. 1410, italics omitted), the court relied on the fact that the defendant possessed the gun during the 90 minutes after the first robbery ended and before the second began, as well as during the 30 minutes after the second robbery ended and before he was arrested. Consequently, "defendant's possession of the weapon was not merely simultaneous with the robberies, but continued before, during and after those crimes. Section 654 therefore does not prohibit separate punishments." (Id. at p. 1413.)

In this case, there is evidence that defendant possessed the shotgun before he committed the remaining offenses. Defendant's wife testified that defendant grabbed the gun when she told him the police had arrived, and that defendant had it "just a little bit before" that. Defendant himself also testified that be possessed the gun before the police arrived:

    "Q Okay. Did you have access to that weapon before [the police] got There?)

    "A Yes, I did have access to it.

    "Q Were you contemplating using that weapon for any reason?

"A Just to take my life that night, that was it."

Defendant's own account then was that he possessed the gun before the police arrived and he began the shootings and that he had prior plans for it. In light of this, we have little hesitation in concluding that the conduct on which count 16 is based was antecedent to and separate from the conduct on which the remaining offenses was based. The court was not required to stay the sentence for count 16.

Finally, in a paragraph almost identical to the one quoted at the end of section II of this opinion, defendant mentions a host of constitutional provisions allegedly violated by the court's imposition of unstayed sentences. Among other things, defendant says the imposition of unstayed sentences violated the double-jeopardy clauses of the state and federal Constitutions because it was multiple punishment for the same conduct. We are aware of no authority for the notion that the double-jeopardy clauses mean a defendant cannot receive several sentences for firing several shots and endangering several victims. In light of defendant's failure to provide any significant briefing on these issues, we need go no further into them. (See Reyes v. Kosha, supra, 65 Cal.App.4th at p. 466, fn. 6.)

(Ex. 1, pp. 32-36).

        B.  Analysis.

Issues of state law sentencing errors generally are not cognizable on federal habeas review, unless the petitioner claims a deprivation of due process or equal protection due to the misapplication of the sentencing law. See Fetterly v. Paskett, 997 F.2d 1295, 1300 (9th Cir. 1993), cert. denied, 115 S.Ct 290 (1994); Featherstone v. Estelle, 948 F.2d 1497, 1500 (9th Cir. 1991); Estelle v. McGuire, 112 S. Ct. 475, 480 (1991) (holding that "it is not the province of a federal habeas court to reexamine state court determinations on state law questions"); Miller v. Vasquez, 868 F. 2d 1116, 1118-19 (9th Cir. 1989) (refusing to address sentence enhancement claim).  Moreover, "[c]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief." James v. Borg, 24 F.3d 20, 29 (9th Cir.1994).

A criminal defendant is entitled to due process at sentencing. Gardner v. Florida, 430 U.S. 349, 358, 979 S. Ct. 1197 (1977). Federal courts must defer to a state court's interpretation of state sentencing laws. Bueno v. Hallahan, 998 F. 2d 86, 88 (9th Cir. 1993). "Absent a showing of fundamental unfairness," a state court's misapplication of its own sentencing laws does not justify federal habeas relief."  Christian v. Rhode, 41 F. 3d 461, 469 (9th Cir. 1994). As a threshold matter, the court must determine whether Petitioner has alleged that his sentence is fundamentally unfair.

A showing of fundamental unfairness has been found under two circumstances: first, where a

state court imposed a sentence in excess of state law. (<u>Walker v. Endell</u>, 850 F. 2d 470, 476 (9th Cir. 19970; <u>see also</u>, <u>Marzano v. Kincheloe</u>, 915 F.2d 549, 552 (9th Cir. 1990) (guilty plea does not permit state court to impose a sentence in excess of state law despite agreement of defendant to sentence). Second, a showing of fundamental unfairness has been found where a state court enhanced a sentence based on materially false or unreliable information or based on a conviction infected by constitutional error. See <u>United States v. Hanna</u>, 49 F.3d 572, 577 (9th Cir. 1995); <u>Walker</u>, 850 F. 2d at 477. Generally, a federal habeas court will not review a state sentence that is within statutory limits. <u>Id</u>. at 476.

Here, it is abundantly clear that Petitioner's sentencing claims are premised entirely on state law.  Petitioner attempts to bootstrap these state law issues into federal constitutional claims by making "drive-by" assertions of due process violations.  However, merely placing a "due process" label on an alleged violation does not entitle Petitioner to federal relief. <u>Langford v. Day</u>, 110 F.3d 1386, 1388-89 (1996). Broad, conclusory allegations of unconstitutionality are insufficient to state a cognizable claim. <u>Jones v. Gomez</u>, 66 F.3d 199, 205 (9th Cir.1995); <u>Greyson v. Kellam</u>, 937 F.2d 1409, 1412 (9th Cir.1991) (bald assertions of ineffective assistance of counsel did not entitle the petitioner to an evidentiary hearing); <u>see also</u> <u>Hiivala v. Wood</u>, 195 F.3d 1098, 1106 (9th Cir.1999), *citing* <u>Gray v. Netherland</u>, 518 U.S. 152, 162-63 (1996) ("general appeals to broad constitutional principles, such as due process, equal protection, and the right to a fair trial, are insufficient to establish exhaustion).

Moreover, Petitioner has failed to show that the sentences were "fundamentally unfair."  He has not shown that the sentences were in excess of California law, nor has he shown that the sentence was based on materially false or unreliable information or based on a conviction infected by constitutional error.  Accordingly, the claim fails to state a cognizable federal habeas claim.

VII.  <u>The Trial Court Erred In Imposing The Upper Term Sentence.</u>

Petitioner's next claim is that the sentencing court erred in sentencing Petitioner to the upper term.  Again, Petitioner's claim is meritless.

///

A. The 5th DCA's Decision.

The appellate court rejected Petitioner's contention with the following analysis:

The court imposed an upper term for count 3, stayed upper terms for counts 6 through 9, and imposed concurrent upper terms for counts 10 through 17.  Defendant argues that the imposition of these upper terms violated the Sixth Amendment as interpreted in Blakely v. Washington (2004) 542 U.S. 296 (Blakely).  Our Supreme Court's recent decision in People v. Black (July 19, 2007, S126182) ____Ca1.4th   (Black II) is dispositive of this issue and requires affirmance.

In Blakely, the United States Supreme Court held that a sentence for kidnapping imposed under the Washington sentencing scheme violated the defendant's Sixth Amendment right to a jury trial. (Blakely, supra, 542 U.S. at pp. 298, 304.)  Under Washington law, the trial court could impose a sentence longer than 53 months only if it found substantial and compelling reasons to do so. (Id. at p. 299.) The judge found that the crime was committed with "deliberate cruelty" and imposed a sentence 90 months. (Id. at p. 298.) The Supreme Court held that this violated the Sixth Amendment as interpreted in Apprendi v. New Jersey (2000) 530 U.S. 466, 490: "'Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" (Blakely, supra, 542 U.S. at p. 301.)  It did not matter that the offense was a class B felony and that class B felonies carried a maximum sentence of 10 years; the state's sentencing law did not allow the sentence to exceed 53 months without judicial factfinding. "Our precedents make clear ... that the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." (Id. at p 303 .)  The court continued:

> "In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment,' [citation], and the judge exceeds his proper authority." (Blakely, supra, 542 U S. at pp. 303-304.)

On January 22, 2007, the United States Supreme Court issued its decision in Cunningham v. California (2007) 549 U.S. _ [127 S.Ct. 856] (Cunningham), overruling People v. Black (2005) 35 Cal.4th 1238 (Black I) and holding that Blakely applies to the imposition of upper terms under California law. (Cunningham, supra, 549 U.S. _ [127 S.Ct. at pp. 860, 871] .) The imposition of an upper term under California law as it stood then was erroneous, therefore, unless it was supported by prior convictions, facts found by the jury, or facts admitted by the defendant.

The California Supreme Court filed its opinion in Black II on July 19, 2007.  It held that the upper term imposed in that case was not erroneous under Cunningham because it was authorized by defendant's prior offenses and the jury's finding that the defendant committed the offense by means of force and fear.  (Black II, supra,_ Cal.4th _. __ [at pp. 17-18, 20].) Whether the trial judge *would* have imposed the upper term based on these factors alone was irrelevant; the question was only whether it *could* have done so under the sentencing law. It could: California's determinate sentencing law allows the trial court to impose the upper term based on a single aggravating factor.  Each of these two factors authorized the upper term independently under California law and each was independently established by means consistent with the Sixth Amendment as interpreted in Blakely and Cunningham. The presence of either one alone would have been sufficient to render the upper term constitutional.  (Id. [at pp. 13, 15-16, 24].)

Black II makes clear that the trial court need not have relied expressly on one of the factors approved by Blakely and Cunningham so long as one of those factors was present in the record and the court was aware of it. The trial court in Black did not assert at sentencing that it was using the defendant's prior convictions as an aggravating factor in support of the upper term. Instead, it said it was imposing the upper term because of "'the nature, seriousness, and circumstances of the crime.'" (Black II, supra, _ Cal.4th _ [at p. 18].) It also stated that it considered "other aggravating circumstances set out in the district attorneys' sentencing brief." These included the defendant's criminal history. The probation report included the defendant's criminal history also. This was sufficient even though the trial court did not mention the defendant' s criminal history explicitly. (Id. [at p. 20].)

Further, where a factor properly established under the Sixth Amendment is present, the court's reliance on other factors that would not satisfy the Sixth Amendment on their own does not undermine the sentence:

> "[S]o long as a defendant is eligible for the upper term by virtue of facts that have been established consistently with Sixth Amendment principles, the federal Constitution permits the trial court to rely upon any number of aggravating circumstances in exercising its discretion to select the appropriate term by balancing aggravating and mitigating circumstances, regardless of whether the facts underlying those circumstances have been found to be true by a jury." (Black II, supra, _ Cal.4th _ [at p. 12].)

In light of all this, it is clear that there was no constitutional error in the imposition of upper terms in the present case. The court's findings in support of imposing upper terms were these:

> "With regard to circumstances in aggravation and mitigation, the Court finds the defendant has engaged in prior violent conduct which indicates a serious danger to society. The defendant's prior convictions and sustained petitions in juvenile delinquency proceedings are numerous. The defendant has served three prior prison terms. The defendant was on parole when the crimes were committed.

> "The defendant was deported from State Prison on July [23d] of 2003. His discharge date would have been May 19th of 2006. The defendant's prior performance on probation was unsatisfactory as evidenced by new law violations while- that occurred while serving grants of probation.

> "And with regard to circumstances in mitigation, the Court will find that the defendant suffered from a mental impairment or mental stress not amounting to a defense. I believe the circumstances of the offense are only explained by the defendant's suicidal thoughts during this action. However, that one circumstance in mitigation is slight, compared to those noted in aggravation. His mental impairment, his suicidal ideation is no excuse or no justification for what he did whatsoever."

According to the probation report, defendant's adult record consisted of five offenses committed between 1999 and 2002. In 1999, defendant suffered a misdemeanor conviction of unlawful sexual intercourse with a person under 18. (§ 261.5.)  In 2000, he committed a felony violation of section 12025, subdivision (a)(1), carrying a concealed weapon in a vehicle. In 2002, defendant committed a felony violation of section 273.5, willful infliction of corporal injury on a spouse or cohabitant. Later in 2002, he committed a felony violation of Health and Safety Code section 11377, subdivision (a), possessing a controlled substance, and a misdemeanor violation of Health and Safety Code section 11364, possessing drug paraphernalia. Defendant also violated the terms of his probation in 2001 and again in 2002.

40

Defendant's juvenile record consisted of three offenses. In 1995, he was found intoxicated in a public place. (§ 647, subd. (f).) In 1996, he drove a motor vehicle without a license. (Veh. Code, § 12500, subd. (a).)  In 1997, he was guilty of being a minor in possession of a handgun. (§ 12101 , subd. (a)(1).) Defendant violated juvenile probation three times.

Under <u>Black II</u>, this record is amply sufficient to support the upper terms. All the aggravating factors the court relied on--prior violent conduct, numerous prior convictions, time in prison, being on parole at the time of the current offenses, and prior violations of probation--were related to defendant's recidivism) At least one of these—numerous prior convictions--cannot meaningfully be distinguished from <u>Blakely 's</u> formulation, approving the use of "'the fact of a prior conviction '" (<u>Blakely, supra</u>, 542 U.S. at p. 301) to increase a sentence. It would not make sense to say that the trial court is entitled to rely on one prior conviction but not on several. In fact, a report of numerous or increasingly serious prior convictions in the probation report and the prosecutor's brief was just what the Supreme Court found adequate in <u>Black II</u>, rejecting the argument that this is not the same thing as the simple fact of a prior conviction:

"Defendant contends he was entitled to a jury trial on the aggravating circumstance of his prior criminal history because, even if the trial court properly may decide whether a defendant has suffered a prior conviction, a jury must determine whether such convictions are numerous or increasingly serious. Defendant, however, reads the 'prior conviction' exception too narrowly." (<u>Black II, supra</u>, _ Cal.4th _ [at p. 21].)

We need not decide whether defendant's juvenile record falls within the exception for prior convictions. His adult record does, and nothing else is needed to support affirmance of the upper terms.

In sum: Because upper terms were authorized by defendant's prior convictions, the court did not err under <u>Blakely</u> and <u>Cunningham</u> in imposing upper terms. We need not discuss the People's claim that defendant forfeited his claim by failing to assert it in the trial court.

(Ex. 1, pp. 37-41).

        B.  <u>Analysis.</u>

As explained above, in rejecting Petitioner's claim, the Court of Appeal found that imposition of the upper term was permissible based on Petitioner's prior convictions.  (LD 1, p. 40.)  Specifically, the 5th DCA pointed to Petitioner's adult record, consisting of three felony and two misdemeanor offenses in a three-year span between 1999 and 2002. (LD 1, p. 40). The appellate court also noted Petitioner had three juvenile offenses, including possession of a handgun.  (<u>Id</u>.).  Additionally, the court noted that Petitioner had violated the terms of probation twice as an adult and three times as a juvenile.  (<u>Id</u>.).

While the imposition of an upper term based on aggravating factors not found by the jury generally violates the Sixth Amendment, the Supreme Court has retained an exception for findings of a defendant's prior convictions.  <u>Cunningham v. California</u>, 549 U.S. 270, 127 S.Ct. 856, 868, 166

41

1   L.Ed.2d 856 (2007); <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435

2   (2000).  Further, "under California law, only one aggravating factor is necessary to set the upper term

3   as the maximum sentence." <u>Butler v. Curry</u>, 528 F.3d 624, 643 (9th Cir.2008).  The fact that the court

4   may have also considered other factors not falling within the prior conviction exception does not affect

5   the analysis. <u>See id.</u> at 648-49 ("[T]he relevant question [regarding a Sixth Amendment sentencing

6   violation] is not what the trial court would have done, but what it legally could have done. After one

7   aggravating factor was validly found, the trial court legally could have imposed the upper term

8   sentence. That the judge might not have done so in the absence of an additional factor does not

9   implicate the Sixth Amendment, as that consideration concerns only the imposition of a sentence

10  within an authorized statutory range.").  For that reason, if at least one of the aggravating factors on

11  which the judge relied in sentencing was established in a manner consistent with the Sixth

12  Amendment, the sentence does not violate the Constitution. <u>Id</u>.

13          Here, the state court applied the correct federal standard, referring to <u>Cunningham</u> and

14  <u>Apprendi</u>.  Since the state court, in imposing Petitioner's sentence, relied at least in part upon the fact

15  of Petitioner's prior convictions, it necessarily follows that the sentence is not susceptible to a Sixth

16  Amendment challenge; hence, the state court's adjudication was neither contrary to nor an

17  unreasonable application of the correct federal standard.

18          VIII. <u>Petitioner Was Deprived Of The Effective Assistance Of Trial Counsel Because Of</u>

19          <u>Counsel's Failure To Conduct A Reasonable Investigation.</u>

20          Finally, Petitioner contends that he was denied his Sixth Amendment right to the effective

21  assistance of counsel at trial because of his counsel's failure to conduct a reasonable investigation.

22  The Court disagrees.

23          The 5th DCA did not discuss this claim in its opinion.  However, summary denials are

24  considered to be merits adjudications, even when they do not explicitly reference the federal claim or

25  provide any legal analysis. <u>Luna v. Cambra</u>, 306 F.3d 954, 960 (9th Cir. 2002).  The <u>Strickland</u>

26  standard has already been discussed at length in a previous section.  Here, Petitioner alleges that his

27  trial counsel was ineffective because he failed to investigate the crime scene, failed to gather his own

28

42

1    evidence, e.g., photos, and never sent an investigator to the crime scene.  (Doc. 1, p. 7).  Additionally,

2    Petitioner complains that trial counsel did not retain a gun specialist to determine the lethal range of

3    the shotgun when filled with bird shot, nor did he follow up on police procedures used when

4    responding to a call of an armed man holding a hostage.  (Id.).

5            It is abundantly clear why the state appellate court summarily denied this claim: i.e., it lacks

6    the specificity required to sustain a Strickland claim.  Petitioner offers a laundry list of actions he

7    believes his attorney should have undertaken in his defense.  However, at no point in the petition does

8    Petitioner provide any information that would establish that, if counsel had indeed undertaken those

9    investigatory tasks, exculpatory and admissible evidence probably would have been obtained that,

10   once presented to the jury, would, more likely than not, have resulted in a more favorable verdict.

11   Petitioner cannot expect this Court to provide habeas relief based on sheer speculation that further

12   investigation would, of necessity, have resulted in the discovery of exculpatory evidence that would

13   have resulted in an acquittal, without providing at least some evidence that additional exculpatory

14   evidence existed that could have been discovered by trial counsel had he undertaken such an

15   investigation.   Petitioner's protestations notwithstanding, it appears that Petitioner's claim that his

16   trial counsel was ineffective was indeed "sour grapes."  Put another way, Petitioner is not so much

17   challenging the way in which his attorney conducted the defense as he is the fact that his attorney did

18   not obtain an acquittal for him.  That is not a valid basis for a Strickland claim.

## RECOMMENDATION

20           Accordingly, the Court RECOMMENDS that Petitioner's Petition for Writ of Habeas Corpus

21   (Doc. 1), be DENIED with prejudice on its merits.

22           This Findings and Recommendation is submitted to the United States District Court Judge

23   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local

24   Rules of Practice for the United States District Court, Eastern District of California.  Within twenty

25   (20) days after being served with a copy of this Findings and Recommendation, any party may file

26   written objections with the Court and serve a copy on all parties.  Such a document should be

27   captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the

Objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

    Dated:   __**September 9, 2013**__          ___**/s/ Jennifer L. Thurston**___
                                                     UNITED STATES MAGISTRATE JUDGE